UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP

| | |
|---|---|
| **UNITED STATES OF AMERICA**            )<br>                                                                   )<br>             v.                                                   )<br>                                                                   )<br>**FARREN G. RICKETTS**                           )<br>                                                                   )<br>                                                                   )<br>                                                                   )<br>                                                                   ) | Case No.<br><br>Violations:<br><br>18 U.S.C. § 371<br>18 U.S.C. § 1349 / § 1341<br>18 U.S.C. § 1028A |

**INFORMATION**

**INTRODUCTION**

The United States Attorney Charges that:

CARES Act and Pandemic Unemployment Benefits

1. Unemployment Insurance (UI) is a state-federal program that provides monetary benefits to eligible lawful workers. Although state workforce agencies (SWAs) administer their respective UI programs, they must do so in accordance with federal laws and regulations. UI payments (benefits) are intended to provide temporary financial assistance to lawful workers who are unemployed through no fault of their own.  Each state sets its own additional requirements for eligibility, benefit amounts, and length of time benefits can be paid. Generally, UI weekly benefit amounts are based on a percentage of earnings over a base period. In the Commonwealth of Virginia, the Virginia Employment Commission (VEC) administers the UI program.

1

USAO # 2021R00179

2. On March 13, 2020, the President of the United States declared the ongoing Coronavirus Disease (COVID-19) pandemic to be an emergency under §501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C §§ 5121-5207).

3. On March 18, 2020, the President signed the Families First Coronavirus Response Act ("FFCRA") into law. The FFCRA provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. The CARES Act expanded states' ability to provide UI for many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI benefits. The CARES Act provided for three new UI programs:  Pandemic Unemployment Assistance ("PUA"); Federal Pandemic Unemployment Compensation ("FPUC"); and Pandemic Emergency Unemployment Compensation ("PEUC").

4. The first program, PUA, provided for up to 39 weeks of benefits to individuals who are self-employed, seeking part-time employment, or otherwise did not qualify for regular UI or extended benefits under state or federal law or PEUC (detailed further below). Coverage included individuals who had exhausted all rights to regular UI benefits or extended benefits under state or federal law or PEUC.   Under the PUA provisions of the CARES Act, a person who is a business owner, self-employed worker, independent contractor, or gig worker can qualify for pandemic unemployment benefits administered by the

USAO # 2021R00179

VEC if he/she previously performed such work in Virginia and is unemployed, partially unemployed, unable to work, or unavailable to work *due to a COVID-19 related reason*. The eligible timeframe to receive PUA included weeks of unemployment beginning on or after January 27, 2020 through December 31, 2020.

5. The second program, PEUC, is a state-federal program that provided for up to 13 weeks of benefits to individuals who had exhausted regular UI under state or federal law, had no rights to regular UI under any other state or federal law, were not receiving UI under the UI laws of Canada, and were otherwise able to work, available for work, and actively seeking work. Under this program, states must offer flexibility in meeting the "actively seeking work" requirement if individuals are unable to search for work because of COVID-19, including because of illness, quarantine, or movement restriction. The eligible timeframe to receive PEUC included weeks of unemployment beginning after the respective state established an agreement with the federal government through December 31, 2020. The earliest being April 5, 2020.

6. The third program, FPUC, provided individuals who were collecting regular UI, PEUC, PUA, and several other forms of benefits with an additional $600 per week. The eligible timeframe to receive FPUC was from weeks of unemployment beginning after the respective state had an established agreement with the federal government through July 31, 2020. The earliest being April 5, 2020.

USAO # 2021R00179

7. On August 8, 2020, after FPUC expired, the President signed a Presidential Memorandum authorizing FEMA to use disaster relief funds pursuant to Section 408 of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19.  The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds.  The period of assistance for LWAP was August 1, 2020 to December 27, 2020.

8. In total, more than $300 billion in additional federal funds for UI were appropriated in 2020.

9. The PUA, FPUC, and LWAP programs (collectively, "pandemic unemployment benefits") are administered by the various states, including the Commonwealth of Virginia, but their benefits are funded by the federal government.  In order to receive pandemic benefits, an applicant must access a website maintained and administered by the VEC and file a claim.  Separate claims are not filed for PUA, FPUC, and LWAP.  Rather, a single claim for PUA, if approved, resulted in an approved claim for the additional FPUC and LWAP benefits as well.

10. Individuals are only eligible for pandemic unemployment benefits if they are unemployed for reasons related to the COVID-19 pandemic and are otherwise available to work and are seeking employment.

11. Once an applicant is at the website, the applicant is required to enter

personally identifiable information (PII) including name, date of birth, Social Security Number, email address, phone number, and physical address. An applicant is then required to answer a series of questions to determine eligibility and payment amount. An applicant must then attest, under penalty of perjury, that the information provided in the claim application is true and accurate.

12. Upon completion, the application is submitted to the VEC. If approved, the applicant can choose whether to have the pandemic unemployment benefits deposited directly into a bank account of their choosing, or the funds can be loaded on a pre-paid debit card which is then shipped to the applicant via United States Postal Service to the address listed on their application.

13. The recipient of pandemic unemployment benefits receives a unique Personal Identification Number ("PIN") to access the VEC each week to re-certify their unemployment status. Payments for pandemic unemployment benefits are based on a seven-day period, from Sunday through Saturday. Thus, the benefits recipient must certify every seven days that he or she: was ready, willing and able to work each day; was seeking full time employment; did not refuse any job offers or referrals; and had reported any employment during the week and the gross pay or other payments received.

The Conspiracy

14. In April 2020, FARREN G. RICKETTS (RICKETTS) and her husband developed a scheme and artifice to file fraudulent claims for pandemic

unemployment benefits via the VEC website.  The scheme and artifice was to submit claims for various individuals, including RICKETTS, her husband, and others who were then known to be ineligible to receive pandemic unemployment benefits by making materially false representations including, but not limited to: that the applicant was unemployed as a result of COVID-19; using a fictitious employer as the name of the last employer when the applicant became unemployed due to COVID-19; that the applicant was ready, willing, and able to work each day; and that the applicant was actively seeking full-time employment.

15. Because pandemic unemployment benefits were paid on a weekly basis, the scheme was a continuing scheme whereby RICKETTS and her co-conspirators agreed and conspired to file weekly re-certifications for the claims they submitted.  In so doing, RICKETTS re-verified and re-certified the same materially false representations and pretenses as stated herein for each claim submitted, on numerous occasions as further detailed below.

16. To effect the object of the conspiracy, RICKETTS and her husband developed a business entity called "Ricketts Advisory, LLC" and advertised services including assistance in filing pandemic unemployment claims. RICKETTS applied for and received a Tax Preparer's Identification Number from the Internal Revenue Service and also registered her business as a limited liability company (LLC) with the Virginia State Corporation Commission. RICKETTS registered her business as an "economic consulting" entity, listing herself as a 51% Chief Executive Member, and her husband as a 49% member.

17. RICKETTS registered her business as operating out of her home in Jonesville, Virginia, which is in the Western District of Virginia. At all relevant times during this conspiracy, RICKETTS resided in Jonesville, Virginia and filed all fraudulent claims from her home in Jonesville, Virginia.

### Manner and Means of the Conspiracy

18. In order to effect the object of the conspiracy, RICKETTS and her co-conspirators undertook the following overt acts, as well as others not detailed herein:

a. RICKETTS first filed a fraudulent claim for pandemic unemployment benefits on behalf of her husband on or about April 2, 2020. On or about April 9, 2020, RICKETTS filed a fraudulent claim for pandemic unemployment benefits on her own behalf. The filing of this fraudulent claim resulted in at least $18,162.00 being paid to RICKETTS including PUA and LWAP payments. At the time of the filings, neither RICKETTS nor her husband was unemployed because of COVID-19; neither was eligible to receive pandemic unemployment benefits.

b. Shortly after filing each claim, RICKETTS received from the VEC via United States Post a monetary determination letter, PIN code, and Mastercard debit card in each co-conspirator's name shipped to a P.O. box in Jonesville, Virginia. The P.O. box was the postal address used by RICKETTS on the fraudulent applications. In order to continue to receive weekly pandemic unemployment benefit deposits, RICKETTS made subsequent weekly re-

certifications for all fraudulent claims through the VEC website.

    c.  After RICKETTS and her husband began receiving pandemic unemployment benefits, RICKETTS' husband started bringing friends and acquaintances to RICKETTS so that she could submit fraudulent claims for pandemic unemployment benefits on their behalf.

    d.  RICKETTS' husband encouraged RICKETTS to begin charging a fee for the service of assisting others in filing fraudulent claims. RICKETTS initially charged a one-time flat fee of $1,000.00 to clients seeking her assistance with filing fraudulent claims. This fee increased to $2,000.00 per client before eventually increasing to $3,000.00 per client. RICKETTS eventually changed her business model to take 32% of the weekly benefits paid for every client she assisted.

    e.  Between May 2020 and February 2021, RICKETTS filed more than 100 fraudulent claims for pandemic unemployment benefits. For many of these claims, RICKETTS created fraudulent documents to support the claims she was filing, including fraudulent IRS Forms (1099-MISC) purporting to document pre-COVID-19 employment income in the names of the respective applicants. RICKETTS filed numerous other fraudulent claims in the names of prison inmates who were *unaware* that she was using their personally identifiable information.

    f.  In or about May 2020, a co-conspirator provided RICKETTS several pages of names and personally identifiable information pertaining to state

inmates in various jail facilities in southwest Virginia and eastern Tennessee. The co-conspirator represented to RICKETTS that the inmates were all sentenced to long jail terms and would not know if she were to file fraudulent claims in their names.  RICKETTS then filed numerous fraudulent claims for pandemic unemployment benefits in these individuals' names, including a claim for an individual identified as L.H.

    g. Because each claim required weekly re-certifications to continue receiving benefits, the conspiracy quickly became more than RICKETTS could handle by herself.  By August 2020, RICKETTS began hiring employees for the purpose of managing and filing weekly certifications for the fraudulent claims that were filed.  In total, RICKETTS hired at least six employees, requiring each to sign nondisclosure and confidentiality agreements. Employees were paid for their services by cash and by access to pre-paid debit cards that were issued by the VEC in the names of various claimants.

## CONCLUSION

  19. **The aggregate *actual* loss for all fraudulent claims filed as part of this conspiracy is not less than $669,124.00.**

## COUNT ONE

## 18 U.S.C. § 371

## (Conspiracy to Commit an Offense / Defraud the United States)

The United States Attorney charges that:

1. The Introduction is realleged and incorporated by reference.

2. Between on or about April 1, 2020, and on or about February 28, 2021 in the Western District of Virginia and elsewhere, **FARREN G. RICKETTS** and others knowingly and willfully conspired and agreed with each other to (1) defraud the United States and (2) commit an offense against the United States, to wit: file fraudulent claims for pandemic unemployment benefits as authorized by, and administered through, federal law in violation of Title 18, United States Code, §1040(a), such benefits being authorized, paid, and disbursed in connection with the Coronavirus Disease (COVID-19) pandemic, an emergency declaration under §501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

3. It was a part of the conspiracy that **FARREN G. RICKETTS** and her co-conspirators submitted fraudulent claims for pandemic unemployment benefits in order to receive funds to which they were not entitled.

4. To effect the object of the conspiracy, **FARREN G. RICKETTS** and her co-conspirators committed several acts, including but not limited to those acts described in the Introduction to this Information.

5. All in violation of Title 18, United States Code, § 371.

USAO # 2021R00179

## COUNT TWO

### 18 U.S.C. § 1349/1341

### (Conspiracy to Commit Mail Fraud)

The United States Attorney charges that:

1. The Introduction is realleged and incorporated by reference.

2. Between on or about April 1, 2020, and on or about February 28, 2021 in the Western District of Virginia and elsewhere, **FARREN G. RICKETTS** and others knowingly conspired with each other to commit mail fraud of benefits authorized by, disbursed, and paid in connection with a presidentially declared major disaster or emergency as defined by section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42. U.S.C. § 5122 et. seq.), in violation of Title 18, United States Code, §1341, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses and representations, and for the purpose of attempting to execute, and executing such scheme and artifice, received a matter or thing, to wit: government debit cards and monetary determination letters, that were sent and delivered by the United States Postal Service.

3. To effect the object of the conspiracy, **FARREN G. RICKETTS** and her co-conspirators committed several acts, including but not limited to, the acts described in the Introduction to this Information.

4. All in violation of Title 18, United States Code, § 1349 and § 1341.

USAO # 2021R00179

## COUNT THREE

## 18 U.S.C § 1028A

## (Aggravated Identity Theft)

1. The Introduction is realleged and incorporated by reference.

2. On or about August 27, 2020, in the Western District of Virginia, **FARREN G. RICKETTS** and others knowingly used, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit: 18 U.S.C. § 1040 and 18 U.S.C. § 1341, knowing that the means of identification belonged to another actual person, to wit: L.H.

3. All in violation of 18 U.S.C. § 1028A(a)(1).

## NOTICE OF FORFEITURE

1. Upon conviction of one or more of the felony offenses alleged in this Indictment, defendant shall forfeit to the United States:

    a. any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

    b. Edit and/or add forfeiture provisions based on SUA to be obtained from draft indictment.

2. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with a third person;
    c. has been placed beyond the jurisdiction of the Court;

USAO # 2021R00179

      d. has been substantially diminished in value; or
      e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

DATE: 6/14/2021

FOR *[signature]*
DANIEL P. BUBAR
Acting United States Attorney

13

USAO # 2021R00179